## THE MONTROSE.

### (District Court, E. D. New York. March 22, 1910.)

SHIPPING (§ 84*)—LIABILITY OF VESSEL—INJURY TO STEVEDORES.

A vessel was lying at a pier discharging cargo, and while libelants, who were stevedores engaged in the work, were descending the ladder leading from the deck to near the stringpiece of the pier, the ladder broke, and they fell between the vessel and the pier and were injured. From the evidence it appeared that the ladder was sound and of sufficient strength to sustain considerably more weight than that of the men who were upon it. The ladder had not been inspected nor its position changed for several hours, and the only reasonable explanation of the accident to be drawn from the evidence was that the falling tide, and the consequent movement of the vessel downward and away from the pier, caused the bottom of the ladder to catch thereon, twisting and fracturing the sides which were both broken at the same height. *Held*, that it was the duty of the vessel to prevent such result, which could readily have been done by raising the ladder, and that she was liable for the injuries to libelants.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. § 350; Dec. Dig. § 84.*]

In admiralty. Suits by Daniel Sullivan, Martin McNulty, John Murray, and Joseph Mulcahy, respectively, against the steamship Montrose. Decrees for libelants.

George W. Bristol, for libelants Sullivan, McNulty, and Murray.
Robert Stewart, for libelant Mulcahy.
Convers & Kirlin, for claimant.

CHATFIELD, District Judge. These four actions arise from an accident which occurred at the noon hour upon the 9th day of March, 1908, at pier 5 of the Bush Terminal in Brooklyn, alongside of which the steamer Montrose was at anchor, from which vessel cargo was being discharged by a gang of longshoremen of which the four libelants were members. The accident to each libelant was occasioned by the breaking of a companionway leading from the deck of the ship to the dock, by which the four men, and at least one other, were precipitated into the water between the dock and the ship, from which accident each of the four libelants sustained injuries.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

The ship had been lying at the dock in question for five days, and the gang of stevedores had used this companionway in going to and from their work. The crew of the ship consisted of Chinese. A watchman was upon the deck of the ship standing near the head of the companionway to prevent the landing of any of the Chinese, and also to look after the property of the ship. This watchman testifies that he cautioned the stevedores as they came out and crowded upon the stairway in question; also, that after the accident he saw at least four men in the water and one on the ladder, while at the time of the break he saw some seven or eight men attempting to go down the ladder at once; and that the top of the ladder was some eight feet above the stringpiece, while the surface of the water was some six feet below the floor or surface of the dock. The testimony of the various witnesses would indicate that at least five men were upon the ladder at the time of the break, and the four men who have filed libels were comparatively close together when they started going down the ladder. Two other men, Tracy and Johnson, were starting to go down, but had not gotten far enough to be precipitated into the water, when the ladder broke. The testimony is to the effect that the break was near the middle of the ladder and between two of the treads or steps. This ladder was some 24 feet long and composed of 2 planks of teakwood, with steps or treads morticed into the sides. The sides were 1⅝ inches thick by 6½ inches wide, while the treads were 1¼ inches thick by 8 inches wide.

One peculiar feature of the present accident was that both sides of the ladder broke entirely off between the same treads, without, apparently, any longitudinal splitting of the planks, and without breaking out any of the treads. The claimant took possession of both parts of the broken ladder and produced upon the trial a section consisting of two treads and the side pieces between those treads, which was sawed the day before one of the depositions in the case was taken (at which time the piece was produced) from the lower portion of the ladder a short distance below the break. One of the most perplexing features of the case has been caused by the failure of the claimant to produce the portion of the ladder including the break itself, and the libelants urge the drawing of certain inferences with respect to what the break might show if it were produced. The claimant's witnesses testify that there was a discoloration of some sort about a foot in length and two or three inches in width, extending into the wood at the point of the break, which had been caused by the presence of some iron supporting the hand line or used in the construction of the ladder; but there were no signs of rot and no imperfections in the wood itself. The companionway or ladder ran from a platform projecting out at the side of the ship, at the level of the deck at this point, and was supported by iron rings to the front edge of this platform. The lower end of the ladder was suspended by a tackle, running to an arm or davit upon the deck of the ship, and a hatch or staging was placed at the bottom of the ladder to furnish easy access to the stringpiece from the foot of the ladder. The tackle enabled the crew of the steamer to raise or lower the foot of the ladder as the vessel might rise or fall with the tide, and the officers of the steamer testified that the bottom of the ladder was usually kept within a foot or so above the level of the dock,

and that the side of the vessel was kept close in to the dock; it being thus the duty of the crew to attend to the raising and lowering of the foot of the ladder to correspond with the height of the vessel.

At the time in question the tide had been falling for several hours, and the testimony of the various witnesses shows that the level of the water was from four to six feet below the top of the stringpiece. The platform at the top of the ladder was some eight or ten feet above the level of the stringpiece; but, according to all of the witnesses who saw the accident and the men immediately thereafter, the vessel was not close alongside of the face of the dock. This is evidently so, as the broken ladder and all of the men who were thereupon fell between the dock and the vessel into the water, and they had space enough to cling to the ladder and swim around while being rescued from this situation.

The libelants' witnesses testify that the vessel was as much as three or four feet off from the dock, and that the foot of the ladder and the platform were some foot or more below the level of the stringpiece. It is difficult to see how the ladder could have broken and the men been precipitated into the water, unless it had been suspended over the water or an open space rather than over the dock itself, inasmuch as the testimony of all the witnesses is to the effect that the break was straight across, and that the ladder fell down directly into the water and out from under the men who were upon it.

Testimony has been offered to show that a ladder of teakwood, in ordinary condition and made of plank of the size in question, would sustain a load of as much as 2,000 pounds, and that a load of 1,000 pounds (even if the ladder were suspended horizontally and the load applied in the middle) would not be sufficient to break the ladder in two. It is evident that, with five or more men upon the ladder, no weight greater than that of any one man could have rested upon the particular step upon which each man was standing, and the treads were not, in fact, broken or misplaced in any way.

The claimant suggests that the five men above described, aggregating some 1,200 pounds, by running down the ladder at a rapid rate close together, and perhaps in uniform step, caused the surging or uniting of strain; and it is apparent that any such situation would cause a resultant force greater than that of the dead weight involved, and not distributed in the same proportion as the men themselves might be distributed throughout the length of the ladder.

If a latent weakness were shown by an examination of the ladder after the break, the explanation offered by the claimant would be extremely reasonable and probably sufficient to relieve the vessel from responsibility. The burden is upon each libelant to prove not only the cause of the injury, but negligence on the part of some one responsible for the steamship with respect thereto.

The doctrine of res ipsa loquitur does not apply in the sense that the mere happening of the accident can be said of itself to raise a presumption of negligence on the part of the vessel.

It does not seem, from an inspection of the portion of the ladder submitted, that the ladder has deteriorated to such an extent that it should be held insufficient for the purpose for which it was used, because of

decay from exposure to the weather. It is true that the surface of the wood is not as impervious to a knife blade as wood which had not been exposed; but it is evident that, in the absence of decay or some plain indication of rot, nothing is shown about the ladder which should demand an inspection, so that it could be called negligence because tests had not been made of its strength. On the other hand, there is no suggestion of any obvious risk or apparent defect which should have been observed by the libelants, other than that those behind must be held responsible for crowding too closely upon those ahead, if their actions in this regard could be said to have caused the accident.

The testimony, however, shows a much more simple cause of the accident, and a situation which is not explained by any testimony offered on the part of the claimant. It seems to be satisfactorily shown that the platform and the lower end of the ladder were below the stringpiece and outside of the face of the dock, and, as has been said, no inspection or change in the position of the ladder had been made for several hours. If the ladder had been resting in the usual position, with the foot of the ladder below the dock, and with the vessel close alongside, at the time of the last inspection or change in the tackle supporting the ladder, and if in the meantime the tide had fallen a distance sufficient to lower the foot of the ladder some two or three feet, while at the same time the set of the tide had carried the vessel away from the dock a sufficient distance to allow the ladder to hang between the vessel and the dock, it almost necessarily follows that the ladder must have been subjected to extreme strain, in order to reach the new position. If the vessel had fallen with the tide straight down on the face of the dock, the foot of the ladder would have rested upon the stringpiece and simply been raised thereby, with a corresponding sliding movement along the dock. If the vessel had been moved outward, without any lowering of the tide level, the ladder would have been carried out without coming in contact wth the stringpiece. But as these two motions under the influence of the tide must have been contemporaneous, the ladder could not get into the position in which it was at the time of the accident without having been twisted by the motion of the vessel, at a time when the foot of the ladder was in contact with the dock, and when the side of the vessel was moving from the face of the dock. Such twisting would result either in the restraint of the entire vessel by the interference of the ladder, or else in a giving way of the ladder under the strain; and such a strain, in the absence of any testimony to the contrary, is more than sufficient to explain a lateral crack in both sides of the ladder sufficient to cause it to give way when five men of the weight of those in question were upon it at one time. The position of the ladder at the time of the accident, and its care and adjustment during the time that the tide was falling, was a duty devolving upon the ship. The men who were to use the ladder could not be considered negligent for not refusing to go up or down it merely because it was hanging over the water instead of the dock, and under the circumstances the ship must be held responsible for the result.

In the case of three of the men permanent damage has not been shown, and the accident resulted merely in their loss of time; while

in the case of Mulcahy, who was at the time 64 years old, the sudden strain and dislocation of his arm, by attempting to save himself from the fall, has resulted in impaired motion of that arm, from which he can never recover. In addition to the time actually lost by him, and $40 paid his doctor, he has since that period been able to earn but $4 a week, and, taking these amounts into consideration, he may have a decree for $1,040 damages and his taxable costs.

The three other libelants may recover, respectively, Murray, $250, McNulty, $250, and Sullivan, $150, with costs of one action. The disbursements prior to the trial may be taxed as a part of the costs of each libelant. The disbursements for stenographer at the trial and for the entry of judgment will be allowed to Mulcahy alone, and may be taxed as a part of his recovery against the vessel.